Filed 9/11/25  P. v. Matute-Casco CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VICTOR MATUTE-CASCO,<br><br>        Defendant and Appellant. | A170762<br><br>(San Francisco City & County<br>Super. Ct. No. CRI-23014336) |

After defendant Victor Matute-Casco (Matute) broke into or attempted to break into several vehicles on a single night, a jury convicted him of various crimes, including six counts of second degree burglary.  The trial court sentenced him to three years in county jail, with the latter two years to be served on mandatory supervision.

On appeal, Matute's only claim is that the trial court erred by denying his motion to exclude all DNA evidence based on the prosecution's late disclosure of the data underlying its experts' reports.  We affirm.

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Between 12:15 a.m. and 5:00 a.m. on September 8, 2023, the San Francisco police received numerous reports of vehicle break-ins in the Excelsior District and Crocker-Amazon area.  The suspect was described as a

"Hispanic male" wearing "dark clothing" and riding a scooter. The evidence showed that at least seven vehicles, all of which their owners had left locked, were targeted. Six of the vehicles had broken windows and blood in their interiors, and one vehicle had a damaged window.

Shortly before 1:00 a.m., the surveillance camera of an Athens Street home recorded a man wearing dark clothing and reflective shoes pull into the home's driveway on a scooter.[1] The footage also showed the man's face and "distinct facial hair," based on which he was later identified as Matute. Matute used a flashlight to look inside a Lexus SUV parked in the driveway, and he repeatedly jabbed the front passenger's window with some sort of tool, cracking it.

Surveillance footage also showed a Lexus sedan parked on the same block of Athens "being damaged." The Lexus's owner later discovered that one of the vehicle's windows was "smashed, and there was blood everywhere." Some earbuds and a pair of sunglasses were missing.

Around 1:15 a.m., a surveillance camera recorded a man wearing reflective shoes pull up on a scooter to an Infiniti parked on Athens, look inside the vehicle with a flashlight, break its front passenger's window, and lean his body inside the car. The Infiniti's owner later discovered that the window was shattered and there was blood throughout the vehicle. In addition, the owner's tool bag, which he kept in the car, was on the sidewalk nearby, and a drill, two batteries, and his driver's license were missing.

The police discovered four other vehicles with broken windows and blood inside them parked in the same area, at the corner of Italy Avenue and Vienna Street: a Toyota Corolla, a Chevrolet, a Kia, and a Toyota Camry. A

---

[1] The surveillance footage we discuss was admitted into evidence, and we have reviewed the portions that are in the record before us.

pair of prescription eyeglasses was missing from the Corolla, a charging pad was missing from the Kia, and a vacuum and two drills were missing from the Camry.  Surveillance footage showed someone walking a scooter near the Chevrolet and Kia around 2:00 a.m.

About two hours later, the owner of a pickup truck parked at the corner of Cordova Street and Athens interrupted Matute as he appeared to be attempting to break the truck's window with a flashlight.  The truck's owner testified that he confronted Matute, whom he had seen in the area before.  Matute said, "What?," and then left on a scooter.

Around 5:00 a.m., two police officers located Matute at the intersection of Naples Street and Athens.  He was "crouched down beside . . . a parked vehicle," "looking into [it] with a flashlight" or a cell phone light.  When the officers illuminated the area, Matute "immediately took off running."  They ordered him to stop, at which point Matute turned and ran a different way.

Eventually, the officers located Matute hiding underneath another parked vehicle.  One of the officers ordered Matute to show his hands and come out, but he did not comply.  The officer then pulled Matute from under the vehicle and saw that he matched the burglary suspect's description.

Matute was arrested and searched.  He had "fresh injuries" on his hands and blood on them and his clothing.  He also had cash bills and a Honda key fob with blood on them.  After learning that a Honda with blood in and around it was near Naples and Athens, one of the officers went there and confirmed the key fob opened that vehicle.  Matute's girlfriend, who owned the Honda and lived on Naples, approached and consented to a search.  A flashlight and other "miscellaneous tools" with blood on them were in the Honda's trunk.  The items included a vacuum and two drills later identified as belonging to the Camry's owner.

The police also searched the girlfriend's home, where Matute was living and which was about two blocks from where he was arrested. Inside, they discovered a scooter with blood on the handle, blood on the girlfriend's bedroom floor, and "black pants that were still wet and soiled and had blood on them" in a hamper. The police also found a pair of Nike running shoes with a small amount of blood on them that had reflectors on the sides and toes, which appeared consistent with the reflective shoes seen in the surveillance videos.

DNA testing confirmed that it was Matute's blood in the Infiniti, Corolla, Camaro, Camry, Kia, and Honda. Blood or bloody items in each of those vehicles was swabbed or collected and compared to a DNA sample from Matute's pants.[2] Two criminalists qualified as experts in forensic DNA testing testified to the effect that the DNA collected from Matute's pants matched the DNA collected from these six vehicles.[3]

Matute was charged with six counts of second degree burglary and two counts of attempted second degree burglary (the Lexus SUV and the pickup truck), all felonies. He was also charged with two misdemeanors, receiving stolen property (the vacuum and tools from the Camry) and resisting a peace

---

[2] A DNA sample is normally obtained by swabbing a suspect's cheek, but no such sample was obtained from Matute. The police officer who swabbed Matute's clothing for DNA originally testified that he obtained the sample from the bloody pants in the hamper. Later, however, he testified that he could not remember whether it came from those pants or the pants Matute was wearing when arrested, which also had blood on them.

[3] The parties suggest in their briefing that Matute was tied to only three of the burglarized vehicles through DNA testing. In fact, DNA testing tied him to all of the burglarized vehicles except the Lexus sedan. It is unclear why no DNA evidence was presented as to that car.

officer.[4]  The jury found Matute guilty of all the charges except attempted burglary of the pickup truck, which the trial court dismissed at the People's request instead of declaring a mistrial.[5]

In May 2024, the trial court sentenced Matute to a total term of three years in jail, composed of a one-year term for resisting a peace officer, a consecutive two-year midterm for the burglary of the Lexus sedan, and concurrent terms of two years for each of the other burglaries and the one-year midterm for the attempted burglary.  A one-year term for receiving stolen property was imposed and stayed.  The court ordered that after serving one year in jail for resisting a peace officer, Matute would serve a split sentence for the Lexus sedan burglary of one day in jail and the remainder of the two-year term on mandatory supervision.

## II.
### DISCUSSION

Matute claims that all his convictions except the one for resisting a peace officer must be reversed because the trial court improperly refused to exclude all DNA evidence after the prosecution's untimely disclosure of the data underlying the DNA experts' opinions.  We are not persuaded.

### A.    *Additional Facts*

The motions in limine were litigated on Thursday, February 1, 2024. On Tuesday, February 6, the day jury selection began, Matute filed a

---

[4] The charges were brought under Penal Code sections 459 (burglary) and 664 (attempted burglary), 496, subdivision (a) (receiving stolen property), and 148, subdivision (a)(1) (resisting officer).  On the People's motion, the trial court also dismissed a count of unlawfully taking a vehicle under Vehicle Code section 10851, subdivision (a), before the case was submitted to the jury.  All further statutory references are to the Penal Code.

[5] The information alleged bail enhancements under section 12022.1, subdivision (b), as to each burglary and attempted burglary, but they were never submitted to the jury or imposed.

supplemental motion in limine to preclude the People "from using any DNA evidence at trial." According to the motion, during discovery the prosecution provided six reports prepared in October 2023 "contain[ing] the conclusions reached by the criminalist[s] regarding the samples examined for DNA." But the defense did not receive "the data on which the [criminalists'] conclusions [were] based" until February 2, the previous Friday. Matute claimed that under sections 1054.1 and 1054.7, the People "had a duty to turn [the data] over 30 days before trial," and the untimely disclosure meant he could not "consult with an expert of his own to potentially challenge the veracity of the conclusions reached by the criminalists in this case."

In response to questioning from the trial court, Matute's trial counsel agreed that she had not filed a motion to compel production of the data, and she admitted that she had not recognized the issue until the prior weekend. The court asked whether counsel needed "a brief continuance to further review" the data. She responded that if the court denied the motion to exclude all DNA evidence, she would have "hopefully enough time" to review the data without a continuance. The court then denied the motion to exclude.

B.    *General Legal Standards*

Section 1054.1 requires disclosure to the defense of specified "materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies," including "(f) [r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the

6

prosecutor intends to offer in evidence at trial." Absent good cause otherwise, the disclosures must "be made at least 30 days prior to the trial." (§ 1054.7.)

Before moving to compel disclosure, a party "shall make an informal request of opposing counsel for the desired materials and information. If within 15 days opposing counsel fails to provide the materials and information requested, the party may seek a court order. Upon a showing that a party has not complied with [its discovery obligations] and upon a showing that the moving party complied with the informal discovery procedure provided in this subdivision, a court may make any order necessary to enforce [discovery requirements], including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).) A court may not, however, exclude witness testimony unless "all other sanctions have been exhausted" (§ 1054.5, subd. (c)), and "the exclusion of testimony is not an appropriate remedy absent a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial." (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358.) We review the denial of a defendant's discovery motion for an abuse of discretion. (*People v. Elder* (2017) 11 Cal.App.5th 123, 131.)

C.    *Matute's Claim Fails for Numerous Reasons.*

To begin with, Matute forfeited this claim by failing to timely seek disclosure of the evidence at issue. The prosecution disclosed the DNA expert reports several months before trial, at which point the defense could have requested the underlying data and filed a motion to compel, if necessary. Matute claims that his trial counsel "had no way of knowing what the

7

prosecution was concealing until it was provided to her at the last moment," but we cannot see how it would be a surprise that the experts' conclusions were based on raw DNA data. Once the defense was on notice that the prosecution intended to rely on DNA evidence, counsel should have sought the underlying data that obviously existed if she wished to explore the possibility of calling her own expert on the subject.

Even if we considered Matute's claim on the merits, we would reject it. Assuming, without deciding, that the prosecution violated its discovery obligations by not turning over the DNA data until shortly before trial, we conclude the trial court did not abuse its discretion by refusing the defense's request to exclude "any DNA evidence" as a sanction. Matute's trial counsel declined the court's offer to continue the matter to give her more time to review the data, and Matute fails to show that preclusion of "an entire category of evidence" was not only an appropriate remedy but the *required* one. (*People v. Edwards* (1993) 17 Cal.App.4th 1249, 1264.) In particular, we disagree that we can infer that the prosecution's untimely disclosure "was willful and done for an improper purpose," as generally required to exclude testimony or a category of evidence. (See *People v. Jordan*, *supra*, 108 Cal.App.4th at p. 359; *Edwards*, at p. 1264.) In fact, the record lacks any evidence of improper intent on the prosecution's part. Thus, the court did not err by declining to exclude all the DNA evidence.

Finally, even if an error occurred, we would find it harmless under any standard. Matute was recorded with his scooter inspecting and breaking into several vehicles in the same small area, six of the vehicles at issue had blood in them that had not been there before, and Matute's hands and clothes had blood on them. Thus, even without DNA evidence establishing that the blood in the vehicles was Matute's, there was ample other evidence that he was the

8

perpetrator of the burglary-related crimes of which he was convicted. As a result, there is no reasonable probability that he would have obtained a more favorable result had the trial court excluded the DNA evidence, and any error in the court's refusal to do so was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P. J.

WE CONCUR:


_____

Banke, J.


_____

Smiley, J.

*People v. Matute-Casco* A170762